**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| SECURA Insurance Company, *as subrogee of Molitor Equipment, LLC, doing business as* Molitor Brothers Farm, | No. 21-cv-1199 (KMM/TNL) |
| Plaintiff, | |
| v. | |
| Deere & Company, | |
| Defendant. | |

| | |
|---|---|
| SECURA Insurance Company, *as subrogee of Molitor Equipment, LLC, doing business as* Molitor Brothers Farm, | No. 21-cv-1200 (KMM/TNL) |
| Plaintiff, | |
| v. | |
| Deere & Company, | |
| Defendant. | |

**ORDER ON SUMMARY JUDGMENT**

These related cases arise out of fires that damaged two John Deere tractors three weeks apart in November 2019. Plaintiff SECURA Insurance Company, acting on behalf of its insured, filed these subrogation actions against Deere, claiming that Deere breached the manufacturer's warranty provided with the tractors. Specifically, SECURA alleges that Deere failed to include "engine side shields" on the tractors that would have

prevented the fires, and the side shields' absence was a defect in "materials and workmanship" that is covered under the warranty. In each case, the parties have filed cross motions for summary judgment, and SECURA seeks to exclude the testimony of Deere's expert witness. For the reasons that follow, Deere's motions are granted, SECURA's motions are denied, and these cases are dismissed with prejudice.

## BACKGROUND

In 2018, Deere was in the process of transitioning its Model 9620RX line of tractors, and other tractors in the 9RX line, to the model year 2019. The 2019 models included several updates to the previous version. One of those changes concerned "engine side shields"—devices that cover exposed portions of the engine. If a tractor does not have the side shields and an operator fails to keep the area on the side of the engine clear of crop debris, that debris can build up, and the heat from the engine can create a fire hazard. The 9620RX tractors being sold in 2018 did not include engine side shields, but the upcoming 2019 models had been designed to include them.

A Deere tractor without the engine side shields is pictured below.



[Shick Decl. ¶ 12; Def. Ex. I, Dkt. 101-9 (21cv1199); Def. Ex. I, Dkt. 100-9 (21cv1200).]

Toward the latter half of 2018, Deere began a "special manufacturing year" for the 9RX line of tractors—model year 2018.5. The 2018.5 tractors were not the same as the 2019 models, but Deere had begun to incorporate some of the updated aspects of the design in preparation for the transition to the 2019 tractors. Among those changes, Deere drilled several holes on the 2018.5 tractor's frame, holes which would eventually accommodate the addition of the 2019 model engine side shields.

In October 2018, Molitor Brothers Farm bought two John Deere Model 9620RX Tractors. Both tractors were part of the 2018.5 special manufacturing year and neither included the engine side shields. But the frames did include the holes that had been drilled for the side shields. Just over a year after the October 2018 purchase, while Molitor was operating the tractors, both caught fire in separate incidents, three weeks apart. The first fire occurred on November 4, 2019, and damaged the tractor that is the subject of Case No. 21-cv-1199; the second fire, which damaged the tractor at issue in Case No. 21-cv-1200, occurred on November 25, 2019.[1]

At the time of the fires, the tractors were under an express manufacturer's warranty provided by Deere. The express warranty provides that Deere will "repair or replace, at its option, any part covered under these warranties which is found to be ***defective in material or workmanship*** during the applicable warranty term." Deere disclaimed the existence of all other warranties, but provided that if the warranty

---

[1] Because the warranties at issue in the two cases are identical, and the factual records regarding each fire are remarkably similar, the Court analyzes them together.

coverage "fails to correct the purchaser's performance problems caused by defects in workmanship and/or materials, purchaser's exclusive remedy shall be limited to payment by John Deere of actual damages in an amount not to exceed the amount paid for the Equipment."

Molitor had an insurance policy on the tractors with SECURA, and after the fires SECURA paid Molitor's claim. SECURA then pursued Molitor's warranty claims against Deere. When Deere first received notice of the fires from Molitor and SECURA on November 7 and December 3, 2019, respectively, Deere asked them to comply with National Fire Protection Association 921 Guide for Fire Investigations, including to preserve evidence, identify witnesses, and put interested parties on notice. Deere did not initially say whether the loss was covered, but wanted SECURA or Molitor to identify the alleged defect that they claimed caused the fire.

Deere and SECURA jointly participated in two inspections of the burned equipment. After the inspections, SECURA took the position that Deere's delay in stating whether the fires were caused by a warrantable defect was an independent breach of the warranty. In the same correspondence, SECURA asserted that Deere breached the warranty because the tractors were defectively designed in that they did not include engine side shields that would have lessened the risk of a fire. Deere denied liability, and these suits followed.

After the cases were filed, early motion practice pared down the scope of SECURA's claims in a way that is significant to the summary judgment ruling. In each case, SECURA's initial Complaint alleged that Deere breached its warranty by selling a

4

defectively designed machine based on the absence of the engine side shields. Deere moved to dismiss the breach-of-warranty claim to the extent that it was based on a design defect. Deere argued that the warranty's coverage for "defects in materials and workmanship" applies only manufacturing defects. SECURA filed an Amended Complaint in each case, modifying the breach-of-warranty claim, in relevant part, to allege that Deere provided a machine that was ***defective in its design and/or manufacture*** because the tractors did not include the engine side shields. Deere renewed its partial motion to dismiss, raising the same narrow issue regarding the warranty claim premised on a defective design.

At that time, these cases were assigned to United States District Judge Eric Tostrud. Judge Tostrud heard Deere's motions on August 23, 2021 and, ruling from the bench, granted Deere's motion as to the design-defect issue. Judge Tostrud reasoned that under the relevant caselaw, Deere's warranty covering defects in materials and workmanship applies only to manufacturing defects, not defective designs. What remains are the following claims: (1) that Deere breached its warranty by failing to respond to the warranty claim in a reasonable time; (2) that Deere breached its warranty by imposing additional obligations on the consumer that were not communicated at the time of purchase; and (3) that Deere breached its warranty by providing a machine that was defective in its manufacture by failing to have the necessary fire shields installed to reduce the likelihood of the tractor fires.

## DISCUSSION

### I.      The Summary Judgment Motions

Deere argues that it is entitled to summary judgment for two overarching reasons. First, Deere asserts that the warranty covers only manufacturing defects, and there is no evidence from which a reasonable jury could conclude that the fires resulted from such a defect. Second, Deere contends that there is no evidence that allegedly improper conduct in response to receiving notice of the fires caused any of SECURA's claimed damages. In support of its motion for summary judgment, SECURA argues that Deere sold Molitor an unreasonably dangerous product, and a reasonable jury could only conclude that the subject tractors were missing a component necessary to prevent the likely occurrence of a fire. SECURA also contends that Deere's actions in response to receiving notice of the fires from Molitor caused the warranty to fail of its essential purpose. Alternatively, SECURA argues that its breach-of-warranty claims should go to trial because a reasonable jury could find in its favor concerning the existence of a manufacturing defect.

As explained below, taking the evidence in the light most favorable to SECURA, the Court finds that Deere is entitled to summary judgment on SECURA's claims. Conversely, taking the evidence in the light most favorable to Deere, SECURA has failed to establish that summary judgment should be granted in its favor.

### A.  Legal Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Dowden v. Cornerstone Nat'l Ins.*

*Co.*, 11 F.4th 866, 872 (8th Cir. 2021). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Id.* at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Irvin v. Richardson*, 20 F.4th 1199 (8th Cir. 2021). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 10131, 1042 (8th Cir. 2011) (en banc).

"When considering [SECURA's] Motion, the Court views the record in the light most favorable to [Deere], and when considering [Deere'] Motion, the Court views the record in the light most favorable to [SECURA]." *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).

### B. Warranty Coverage

The law[2] governing a claim for breach of a warranty is straightforward. An express warranty is created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Minn. Stat. § 336.2-313(1)(a). "The elements for a claim of breach of warranty under the UCC are (1) the existence of a warranty; (2) breach of the warranty; and (3) causation of damages." *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 393 (Minn. Ct. App. 2004) (citing *Peterson v. Bendix Home Sys., Inc.,* 318 N.W.2d 50, 52–53 (Minn. 1982)).

Deere's warranty provides coverage for parts "found to be defective in material or workmanship" and disclaimed all other warranties. [Am. Compl., Ex. A at 1 (21cv1199); Am. Compl., Ex. A at 1 (21cv1200).] As Judge Tostrud explained in ruling on the motion to dismiss, when a warranty uses this language, it provides coverage for manufacturing defects. "A product . . . contains a manufacturing defect when the product **departs from its intended design** even though all possible care was exercised in the preparation and marketing of the product." Restatement (Third) of Torts: Prod. Liab. § 2(a) (1998) (emphasis added); 4A Minn. Prac., Jury Instr. Guides--Civil CIVJIG 75.30 (6th ed.) (providing that a "product is in a defective condition unreasonably dangerous to (the ordinary user or consumer) (the ordinary user's or consumer's property) when the

---

[2] The parties agree that the substantive law of Minnesota applies in these diversity actions. *E.g.*, *Gen. Elec. Capital Corp. v. Union Planters Bank, N.A.*, 409 F.3d 1049, 1053 (8th Cir. 2005).

product *departs from its intended design*, even though all possible care was exercised in the preparation and marketing of the product") (emphasis added).

### 1.  "Flawless Product" v. "Departs from Intended Design"

SECURA argues that its breach-of-warranty manufacturing-defect claims should not be judged by the departure-from-intended-design standard and should instead be evaluated by a "flawless product" or consumer-expectation standard. SECURA suggests that under this formulation, a jury should be permitted to decide whether the tractors were unreasonably dangerous for failing to include the engine side shields and should essentially be instructed according to negligence and strict-liability principles. [Pl.'s Opp'n 13, Dkt. 107 (21cv1200).]

The Court rejects SECURA's argument for two reasons. First, although the Minnesota Supreme Court has used the term "flawless product" when describing the standard for manufacturing-defect cases, the more common articulation of how to assess such a claim is whether the product departs from its intended design, so the "flawless product" concept is not a stand-alone test. As importantly, the term "flawless product" cannot be stretched in the manner proffered by SECURA.

The Minnesota appellate courts have not expressly adopted the departure-from-intended-design formulation for manufacturing defects, nor have they rejected it. And § 2(a) of the Restatement and CIVJIG 75.30 are consistent with both Minnesota law and the overwhelming weight of persuasive precedent. In fact, the Minnesota Supreme Court has quoted § 2(a) of the Restatement approvingly when describing what a manufacturing defect is under products-liability law. In *Harrison ex rel. Harrison v. Harrison*, 733

N.W.2d 451 (Minn. 2007), the court stated that "[a] manufacturing defect in the product liability context means 'the product departs from its intended design.'" *Id.* at 455 n.2.

Courts within this District have used similar language in describing manufacturing defects. *Sadeghi-A v. Daimler Trucks N. Am. LLC*, No. 19-CV-2373 (MJD/ECW), 2022 WL 16554615, at *3 (D. Minn. Oct. 31, 2022) ("To show a manufacturing defect, Plaintiff must establish that ***the product departs from its intended design***, that it did so when it left a defendant's control, and that this defect proximately caused the plaintiff damages.") (emphasis added), *amended on reconsideration*, No. 19-CV-2373 (MJD/ECW), 2022 WL 16554615 (D. Minn. Oct. 31, 2022); *In re Hardieplank Fiber Cement Siding Litig.*, 284 F. Supp. 3d 918, 933–34 (D. Minn. 2018); *see also Reid v. Wright Med. Tech., Inc.*, File No. 19-cv-1471 (ECT/HB), 2019 WL 4861988, at *2 (D. Minn. Oct. 2, 2019).

This is also consistent with how the Eighth Circuit has analyzed the manufacturing-defect issue in a case where a warranty similarly covered defects in "workmanship and materials," albeit under Indiana law. In *Bruce Martin Construction, Inc. v. CTB, Inc.*, 735 F.3d 750 (8th Cir. 2013), the court explained that "case law from outside Indiana reflects an understanding that defects in material and workmanship ***refer to departures from a product's intended design*** while design defects refer to the inadequacy of the design itself." *Id.* at 753 (emphasis added). The *Bruce Martin* court affirmed the district court's order granting the defendant's motion for summary judgment because the problem about which the plaintiff complained was not a manufacturing defect that fell within the express warranty provision. Specifically, the plaintiff alleged

10

that the grain silo sweeper at issue was defective because the metal with which it had been made was too flimsy for the sweeper to operate effectively. But the court explained that this claim asserted a defect in the design of the machine because the allegedly flimsy metal was the very metal that the machine was supposed to include—it was not a deviation from the intended design, so it was not a defect in materials and workmanship, and therefore not a breach of the express warranty. 754 F.3d at 752–54.[3]

SECURA draws its argument that the lack of an engine side shield can be a covered manufacturing defect from the Minnesota Supreme Court's use of "flawless product" in *Bilotta v. Kelley Company, Inc.*, 346 N.W.2d 616 (Minn. 1984). However, *Bilotta*'s "flawless product" language does not mean what SECURA implies, and it does not supplant the coherent treatment of manufacturing defect claims outlined above. In *Bilotta*, the court distinguished between the appropriate instructions to give juries in design-defect cases and manufacturing-defect cases. The court rejected the use of the consumer-expectation standard in design-defect cases because negligence and strict liability theories merge in such cases. *Id.* at 622. But, the court explained that, in manufacturing-defect cases, the theories are distinct. *Id.* When the focus is on a manufacturing flaw, "an objective standard exists—the flawless product—by which a jury can measure the alleged defect. Thus, in manufacturing-flaw cases, the defect is

---

[3] *Sadeghi-A*, 2022 WL 769975, at *7 ("The phrase 'defects in material and workmanship' refers to manufacturing defects: 'defects in material and workmanship refer to departures from a product's intended design while design defects refer to the inadequacy of the design itself.'" (quoting *Bruce Martin*, 735 F.3d at 753).

proved by focusing on the condition of the product." *Id.* "[T]he manufacturer's conduct is irrelevant." *Id.*[4]

This Court reads *Bilotta*'s reference to the "flawless product" to be consistent with *Harrison*'s definition of a manufacturing-defect, § 2(a) of the Restatement, CIVJIG 75.30, and the overwhelming majority of persuasive precedent, all of which evaluate manufacturing defects by whether the product deviates from its intended design. It is another way of saying the same thing, rather than a different test. Under *Bilotta* the objective standard of the "flawless product" against which the allegedly defective product is measured does not focus on the choices the manufacturer made about "the arrangement of elements that make up a machine, and the process of selecting the means and contriving the elements, steps, and procedures for producing what will adequately satisfy some need," because that is the definition of the product's design. *Bruce Martin*, 735 F.3d at 753 n.2 (cleaned up). Rather, the Court finds that *Bilotta*, like *Bruce Martin*, is referring to "the mechanical process of implementing that design." 735 F.3d at 753 n.2. SECURA's argument for applying a negligence approach that would necessarily consider the reasonableness of the manufacturer's choices merely attempts to reintroduce the already dismissed design-defect theory of the breach-of-warranty claim. And neither

---

[4] The authors of a leading treatise on Minnesota's law of products liability concluded that the standard for manufacturing-defect claims articulated in *Bilotta* is consistent with the standard in the Restatement (Third) of Torts: Products Liability § 2(a). 27 Minn. Prac., Prods. Liab. Law § 2.2, *Manufacturing Defects* (2022 ed., Westlaw update)).

*Bilotta* nor the term "flawless product" can bear the weight of SECURA's effort. The Court rejects that attempt.[5]

Accordingly, consistent with the law that Judge Tostrud outlined quite early in this case, the Court will evaluate whether there is any genuine issue for trial concerning the subject tractors' alleged departure from their intended design.

### 2.  Departure from Intended Design in this Case

In light of this analysis, SECURA's warranty claim hinges on whether the subject tractors departed from their intended design by failing to include engine side shields. Deere is entitled to summary judgment on this claim because, viewing all the evidence in the light most favorable to SECURA, there is no genuine dispute that the tractors Molitor purchased in October 2018 were not designed to include engine side shields.

The evidence shows that Deere never intended engine side shields to be included on the subject tractors. [Schick Decl. ¶ 8, Dkt. 102 (21cv1199); Schick Decl. ¶ 8, Dkt. 101 (21cv1200).] Deere provides a Bill of Materials for each of its machines, which Deere refers to colloquially as the "Birth Certificate." These documents include a list of

---

[5] SECURA fares no better in opposing Deere's motion (or in support of its own) by characterizing the absence of the engine side shields on the tractors that Molitor purchased as a "manufacturing decision," whether through the report or testimony of SECURA's expert, Steven Hamers, or through its counsel's argument. The Court finds that the "manufacturing decision" SECURA refers to is just another name for the design-defect theory that it has been attempting to litigate since the inception of this case— namely that Deere should have designed the tractors at issue to include the engine side shields because they would have presented less risk of a fire from the buildup of crop debris. But the warranty only covers defects in "materials and workmanship," and SECURA provides no authority to suggest that the so-called "manufacturing decision" about which it complains constitutes such a flaw.

every component that Deere intends to make up the relevant machine. [Shick Decl. ¶ 9.] Engine side shields appear nowhere on the Bill of Materials for the tractors that Molitor purchased. [Hamers Dep. 45–46, Def. Ex. O, Dkt. 114-3 (21cv1200).] Nor do engine side shields show up in the relevant parts catalog. [Schick Decl. ¶ 12; Def. Ex. H, Dkt. 101-8 (21cv1199); Def. Ex. H, Dkt. 100-8 (21cv1200).]

SECURA does not point to any evidence that creates a genuine fact dispute about whether the side shields were part of the intended design of the subject tractors and were therefore supposed to be included. As explained below, the evidence on which SECURA relies to suggest otherwise, even taken in the light most favorable to SECURA, would not allow a reasonable jury to find that the absence of the side shields on the subject tractors was a defect in materials and workmanship.

### The Frame Holes

SECURA points to Deere's addition of the frame holes in the 2018.5 Model tractors as evidence that the subject tractors' intended design included the side shields. SECURA correctly notes that the frame holes' purpose was to achieve eventual compatibility with engine side shields, but this does not create a genuine issue for trial. The holes are "only one of the frame revisions necessary to accommodate engine side shields." [Shick Decl. ¶ 13; Def. Ex. K, Dkt. 101-11 (21cv1199); Def. Ex. K, Dkt. 100-11 (21cv1200).] The holes appeared as part of Deere's ongoing grouping of manufacturing changes, which it rolled out as part of its development process for purposes of efficiency. [Schick Decl. ¶ 13; Def. Ex. J, Schick Dep. 256–59, Dkt. 101-10 (21cv1199); Def. Ex. J,

Shick Dep. 256–59, Dkt. 100-10 (21cv1200).] However, these holes did not make the engine side shields part of the 2018.5 design.

In fact, the evidence shows that the tractors sold to Molitor could not have included engine side shields. [Schick Decl. ¶ 11.] That is because "dozens of other parts" would be needed to add the side shields to the tractors, and those parts are not found anywhere in the Birth Certificate information. [Schick Decl. ¶ 10; Def. Ex. G, Birth Certificate Information - Components, Dkt. 101-7 (21cv1199); Def. Ex. G, Birth Certificate Information - Components, Dkt. 100-7 (21cv1200); Hamers Dep. 46–47.] Additionally, certain parts included on the 2018.5 Models would need to be removed or modified for an engine side shield to be added. [Def. Ex. K, Installation Instructions, Dkt. 100-11 (21cv1200).] SECURA pointed to no evidence in the record disputing that such substantial modifications would have been needed to incorporate the side shields into the 2018.5 model tractors, and thus no reasonable jury could determine that the presence of the frame holes alone indicated that the shields were part of the pre-2019 design.

### SECURA's Expert

SECURA also relies heavily on the testimony of its expert witness, Steven Hamers, to suggest that there is a genuine dispute concerning the engine side shields being part of the subject tractors' intended design.[6] But neither Mr. Hamers's testimony nor his expert report create a genuine issue for trial concerning the engine side shileds. For example, SECURA suggests that his testimony could allow a jury to conclude that

---

[6] Pl.'s Opp'n 19 n.51.

the tractors were compatible with the inclusion of engine side shields, but within the cited excerpt of his deposition, Mr. Hamers agreed that the tractors would have to be modified before the side shields could be installed. [Hamers Dep. 55:9–15.] Similarly, SECURA suggests that there is a dispute about whether the intended design of the tractors included the engine side shields, but Mr. Hamers merely stated that he didn't think he could say whether the side shields were part of the intended design without seeing the relevant design drawings. [Hamers Dep. 42:11–22.] Similarly, Hamers testified equivocally that he didn't know whether the absence of side shields in an image from the subject tractros' marketing brochure indicated that they were not part of the intended design. [Hamers Dep. 57:19–58:12.][7] Nevertheless, Mr. Hamers admitted that the engine side shields were not listed in the Bill of Materials for the 2018.5 model tractors, nor in the Birth Certificate information for the two tractors purchased by Molitor. [Hamers Dep. 45:1–46:15, 46:17–47:3.] SECURA has not explained why design drawings would somehow have shown that engine side shields were part of the intended design when they were not listed in the document that includes every part on the machine.

In his report in each case, Mr. Hamers states that the tractor at issue "included changes to the tractor frame that were intended to allow for the installation of the engine side shields," referring to the addition of the frame holes. [*E.g.*, Pl.'s Ex. E ("Hamers Report") at 7, Dkt. 109-1 (21cv1200).] Hamers goes on to describe how, after Molitor

---

[7] SECURA moved to compel production of the design drawings for the tractors, presented argument before Magistrate Judge Becky Thorson about why the drawings were relevant and proportional to the needs of the case, and its motion to compel was denied. [Tr. of Hr'g (Feb. 9, 2022), Dkt. 85 (21cv1200).]

had already purchased the tractors at issue, Deere created a program, discussed in greater detail below, by which customers could modify their machines to add the engine side shields. [*Id.*] That program was adopted, according to Mr. Hamers, because Deere was aware that a buildup of debris on the engine manifold created a fire hazard. [*Id.*] This all occurred while, during the fall of 2019, Deere had begun building 2019 models that included the engine side shields. [*Id.* at 7–8.] From these facts, Mr. Hamers draws the following conclusion:

> [T]he 2018.5 John Deere 9620RX tractors were designed to accept the engine side shields and the identical parts needed to add the side shields to the 2018.5 were being installed on the 2019 model tractors in the fall of 2018. Deere & Company made a manufacturing decision to not add the engine side shields to the 2018.5 model tractors. . . .

[*id.* at 9–10.]

For at least three reasons, the Hamers Report does not create any issue of material fact. First, regardless of how his conclusions are worded, Mr. Hamers acknowledges that the 2018.5 tractors required modifications before engine side shields could be added. Second, as described in more detail below, the program Mr. Hamers refers to was not developed until ***after*** Molitor bought the tractors at issue in this case, so it says nothing about the design of the subject tractors at the time they were purchased. And third, Mr. Hamers's assertion that Deere made a "manufacturing decision" not to include the side shields on the 2018.5 model tractors is a poorly disguised effort at reintroducing the design-defect aspect of the warranty claim that has already been dismissed from this action.

17

*The Side Shield PEP*

In opposition to Deere's motion and in support of its own, SECURA also points to Deere's processes for developing changes to its machines, as reflected in its Warranty Administration Manual ("Manual"). [Manual, Dkt. 59 (21cv1200).] SECURA suggests that the evidence relating to these processes demonstrates that the 2018.5 tractors were, in fact, designed to accept the fire shields. But even viewing the Manual in the light most favorable to SECURA, a reasonable jury could not conclude that the engine side shields were part of the intended design of the Molitor tractors.

The Manual reveals that Deere will occasionally repair or otherwise address known issues with its equipment through either a Product Improvement Program ("PIP") or a Product Enhancement Program ("PEP"). [*Id.* at 53.] A PIP may be adopted as a mandatory update for equipment when there is an "unreasonable risk of fire," and in the instances when there is a serious safety concern, Deere will pay for the changes to the equipment. By contrast, under a PEP, Deere will offer its customers an update that can improve machine performance, but because a PEP is not designed "to remedy a potential problem, . . . customer financial participation is involved." [*Id.*]

On August 28, 2019, Deere implemented program No. 81RW816 A-H for the 9RX Model machines, which was titled "9R & 9RX Side Shields Enhancement." Deere classified the program as a PEP, thereby allowing customers, if they were interested, to put engine side shields on tractors to address the issue of debris accumulation on the exhaust manifold. [Schick Dep. (Dec. 16, 2021) ("12/16 Schick Dep.") at 127–28, 176, Pl.'s Ex. B, Dkt. 108-2 (21cv1200).] Troy Schick, Deere's expert witness and a former

Deere employee, noted that the buildup of debris on the exhaust manifold could lead to a fire. [12/16 Schick Dep. at 148, Dkt. 109 (21cv1200).]

SECURA argues that it was inappropriate for Deere to classify the program as a PEP instead of a PIP when its purpose was to address a risk of fire caused by the buildup of crop debris. But SECURA's argument is a red herring. As discussed above in the context of the Hamers Report, Deere's implementation of the program is irrelevant to the question of whether the tractors departed from their intended design. Molitor bought the tractors in October 2018, and the Deere side-shield-enhancement program was not put in place until August 2019. A program developed in August 2019 does not tell us anything about what was included in the intended design of a machine that was sold in October 2018, and therefore, the existence of any fact dispute regarding whether the after-market addition of engine side shields should have been a PIP is simply not material to the outcome of these cases.

In sum, the warranty requires Deere to provide a remedy only when the tractor is defective in "materials or workmanship"—i.e., when the product departs from its intended design so that there is a manufacturing defect. When viewed in the light most favorable to SECURA, the undisputed evidence shows that SECURA cannot establish that the tractor fires in these cases were the result of any manufacturing defect. Therefore, it cannot show that Deere's decision not to provide a remedy under the warranty was a breach, and Deere is entitled to summary judgment on this claim. The same record demonstrates that SECURA is not entitled to summary judgment on this claim and its motion is denied.

### C. Adequacy of Deere's Response to the Warranty Claim

SECURA's remaining claims assert that Deere breached its warranty by failing to respond to the warranty claim within a reasonable time and imposing additional conditions to obtaining warranty coverage on Molitor that were not disclosed at the time of purchase. Deere seeks summary judgment on these claims because SECURA has failed to present evidence that the conduct complained of in these asserted breaches caused any of SECURA's claimed damages. SECURA counters that the undisputed evidence demonstrates that Deere's response to Molitor's warranty claim caused the warranty to fail of its essential purpose, or alternatively, there is at least a question for trial on this issue.

***Damages***

As noted, one of the essential elements of a breach-of-warranty claim is that a plaintiff must prove "a causal link between the breach and the alleged harm." *Daigle v. Ford Motor Co.*, 713 F. Supp. 2d 822, 825 (D. Minn. 2010). "In order to survive summary judgment, Plaintiffs must raise a genuine issue of material fact regarding whether [defendant's] alleged breach of the warranty caused them damages." *Bollom v. Brunswick Corp.*, 453 F. Supp. 3d 1206, 1221 (D. Minn. 2020).

The Court finds there is no genuine dispute of material fact on this issue and Deere is entitled to summary judgment. In SECURA's initial disclosures in Case. No. 21cv1199, it identified the following categories of damages: (1) a sum for the value of the subject tractor; (2) the cost of repairs to a "disc ripper"; (3) the value of Molitor's personal property destroyed in the tractor; and (4) a fire department charge. [Def. Ex. L at

20

8, Dkt. 101-12 (21cv1199).] In Case No. 21cv1200, SECURA identified the following similar damages categories: (1) the value of the subject tractor; (2) the value of a destroyed "Sunflower Disc Ripper"; and (3) a fire department charge. [Def. Ex. L at 9, Dkt. 100-12 (21cv1200).] These categories of damages are unrelated to and predated Deere's response to Molitor's warranty claim. No reasonable jury could find that Deere's alleged delay in stating its position about whether the fire was caused by a warranted defect cause the tractors and other property to be damaged by fire. And the complained of conduct certainly did not cause Molitor to incur a fire department charge.

Otherwise, with respect to the damages it is pursuing, SECURA references only the allegations in its Amended Complaints.[8] But it is axiomatic that a party may not rely on the allegations in a pleading to overcome a properly supported motion for summary judgment. *Kountze ex rel. Hitchcock Found. v. Gaines*, 536 F.3d 813, 818 (8th Cir. 2008) ("Simply referencing the complaint, or alleging that a fact is otherwise, is insufficient to show there is a genuine issue for trial." (citing *Celotex*, 477 U.S. at 324)). In cases where summary judgment has been denied with respect to this issue, courts have identified material evidentiary disputes as to causation of damages. *E.g.*, *Windsor Craft Sales, LLC v. VICEM Yat Sanayi*, Civil No. 10-297 ADM/JJG, 2012 WL 639432, at *6 (D. Minn. Feb. 28, 2012) ("The remaining two elements of a breach of express warranty claim— breach and causation—involve disputed, material facts, and are therefore not proper for

---

[8] Pl.'s Opp'n at 22 & n.59 ("SECURA's Amended Complaint alleged that the 'aforementioned breaches are a direct and proximate cause of the fire **and** resultant damage to SECURA as described above." (citing Dkt. 17 ¶ 34 (21cv1200))) (emphasis in original).

summary judgment."). Accordingly, Deere is entitled to summary judgment on these claims.

### *Warranty Fails of Its Essential Purpose*

Despite the absence of any evidence tying Deere's response to any of SECURA's damages, SECURA argues that the Court should deny Deere's motion and grant summary judgment in favor of SECURA because Deere's actions caused the warranty to fail of its essential purpose or constituted a failure to cure the alleged defect. The Court concludes otherwise.[9]

Exclusive remedy provisions provide a remedy to a buyer and a limitation on liability for the seller. *Durfee v. Rod Baxter Imps., Inc.*, 262 N.W.2d 349, 356 (Minn. 1977). "An exclusive remedy fails of its essential purpose if circumstances arise to deprive the limiting clause of its meaning or one party of the substantial value of its bargain." *Luckey v. Alside, Inc.*, 245 F. Supp. 3d 1080, 1089 (D. Minn. 2017) (quotation marks omitted); Minn. Stat. § 336.2-719 cmt. 1 ("[W]here an apparently fair and

---

[9] SECURA suggests that Deere's conduct caused the warranty to fail of its essential purpose because, in part, Deere failed to investigate the cause of the fires. [*E.g.*, Dkt. 117 at 15–16 (21cv1200).] However, in each Amended Complaint, Plaintiff has alleged that Deere participated in two separate investigations of the subject tractors. [E.g., Am. Compl. ¶¶ 20–21 (21cv1199).] Deere's own investigators—Product Safety Engineers Scott Steege and Jordan Tagtow—were present at and participated in those inspections. [Pl.'s SJ Ex. D, Dkt. 118-4 (21cv1200); Pl.'s SJ Ex. E, Dkt. 118-5 (21cv1200).] That fact is further confirmed by Plaintiff's counsel's correspondence with Deere, which notes that the inspections took place on December 12, 2019 and July 22, 2020. [Def. Ex. D at 1.] Neither of Deere's inspectors found a defect in materials or workmanship during their inspections. [Second Schick Decl. ¶ 7, Dkt. 133-1 (21cv1200).] The Court finds SECURA's failure-to-investigate argument unsupported by the record, and it provides no basis for denying Deere's motion for summary judgment, nor for granting summary judgment in SECURA's favor.

reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article."). When there is a repair and replacement clause, like in the limited warranty at issue in this case, if the seller replaced goods each time a defect appears, the clause does not fail of its essential purpose. *Durfee*, 262 N.W.2d at 356. But if a seller does not provide the limited remedy within a reasonable time, the buyer may lose the benefit of the limited remedy. *Id.* If a limited remedy fails of its essential purpose, then the plaintiff may recover the purchase price. *Id.*

*Durfee* is the leading Minnesota case where a plaintiff encountered defects so repeatedly and persistently that he never received the substantial value of the limited repair-and-replacement remedy in the manufacturer's warranty. The plaintiff's Saab experienced repeated problems from nearly the moment plaintiff purchased it, rendering it largely inoperable. 262 N.W.2d at 351–52. The vehicle was covered by a one-year warranty that it would be free of defects in materials and workmanship. *Id.* at 353 n.3. Whether the issues with the car were defects covered by the warranty appeared to be uncontested, but the discussion of when a limited remedy fails of its essential purpose presupposed the existence of a defect that the seller had a duty to address in the first instance. *See id.* at 356 (explaining that a limited remedy does not fail of its essential purpose "[s]o long as the seller repairs the goods each time a defect arises" and discussing the seller's "obligation to repair" not being relieved by expense and effort); *see also Huffman v. Electrolux N. Am., Inc.*, 961 F. Supp. 2d 875, 886 (N.D. Ohio 2013), ("If there is no evidence on which to base a finding that a manufacturer was unable or

unwilling to repair and/or replace in a reasonable time ***a covered defect*** occurring during the warranty period, it is unreasonable as a matter of law to conclude that the remedy failed of its essential purpose.") (cleaned up, emphasis added, applying Ohio law), *on reconsideration sub nom. Huffman v. Electrolux Home Prod., Inc.*, No. 3:12CV2681, 2013 WL 5591939 (N.D. Ohio Sept. 30, 2013).

SECURA has failed to show any genuine dispute for trial on this issue because this case does not involve any defect to which the warranty applies. Consequently, any failure by Deere to repair or replace Molitor's tractors or any component of those tractors did not cause the warranty to fail of its essential purpose. *Cf. Iowa Great Lakes Sanitary Dist. v. Travelers Cas. & Sur. Co. of Am.*, 913 F.3d 760, 763 (8th Cir. 2019) ("Evidence of a defect is an indispensable element of any express or implied warranty claim." (quoting *Coop. Power Ass'n v. Westinghouse Elec. Corp.*, 60 F.3d 1336, 1344-45 (8th Cir. 1995)). The warranty itself contemplates that only when there is a manufacturing defect is an alternative to the limited repair-and-replace remedy available. It specifies the following:

> In the event the above warranty fails to correct purchaser's performance problems ***caused by defects in workmanship and/or materials***, purchaser's exclusive remedy shall be limited to payment by John Deere of actual damages in an amount not to exceed the amount paid for the Equipment.

[Dkt. 17-1 (21cv1200) (emphasis added).]. Here, Deere's alleged undue delay in stating that the fires were not attributable to a warrantable defect and Deere's request for information regarding the fire pursuant to NFPA 921 did not cause the warranty to fail of its essential purpose because the essential purpose of the warranty was to cover defects in

workmanship or materials. As discussed above, there is no evidence that would allow a reasonable jury to conclude that the Molitor tractor fires were caused by such a defect.

SECURA contends that there is at least a fact issue for trial concerning whether Deere required Molitor to do more to obtain warranty service in this case than is required under the warranty's plain terms. Specifically, SECURA points to the testimony of Deere's Rule 30(b)(6) witness in *Nationwide Agribusiness Insurance Company, v. Deere & Company*, No. 4:19-cv-00425-O (N.D. Tex.), and suggests that although Deere insisted *in these cases* that Molitor was required to first identify the defect that it believed caused the fires, in *Nationwide Agribusiness*, Deere testified that customers have no such obligation to trigger Deere's responsibility to determine whether the problem was caused by a warrantable defect.[10] SECURA's reliance on this testimony does not defeat Deere's motion for summary judgment for at least two reasons.

First, even if one assumes that this evidence creates a genuine dispute about whether Deere required Molitor to do more than should be required of a purchaser to receive warranty service, such a dispute is immaterial to the question of whether Deere's response to the notice of the fires caused any of SECURA's claimed damages. SECURA does not point to any evidence to suggest that this alleged dispute is tied to the damages SECURA is pursuing, nor does SECURA make any persuasive argument that it could be.

Second, to the extent SECURA relies on this testimony in support of its argument that Deere's post-notice actions caused the warranties in these cases to fail of their

---

[10] See Pl.'s Opp'n at 27–28 (discussing Dkt. 17-3 (*Nationwide Agribusiness* deposition transcript excerpt).

essential purpose, *Nationwide Agribusiness* actually illustrates the opposite. *Nationwide Agribusiness* involved fire damages to a piece of Deere machinery known as a "cotton stripper," and the plaintiff there alleged that the fire was caused by a defect in workmanship and materials. Specifically, the plaintiff asserted that "various bolt heads associated with the saw tooth blade" would shear off during "normal operation" of the cotton stripper. No. 4:19-cv-425-O, Doc. 16 at 1 (N.D. Tex. Aug. 26, 2019). Before the case was dismissed pursuant to the parties' joint stipulation, the *Nationwide Agribusiness* court denied Deere's motion for summary judgment, in part, because it found there was evidence in the record that the bolts had been "overtightened during the manufacture" of the machine, and the "separation of the bolt heads to the fasteners allowed the saw tooth blade to bend back from the drum and produce, while loaded with cotton, metal to metal contact with the doffer." No. 4:19-cv-425-), Doc. 85 at 8 (N.D. Tex. Sept. 22, 2020). In other words, the court identified evidence in the record from which a jury could conclude that the fire was caused by a covered defect, a manufacturing flaw rather than a design flaw. Further, the court rejected Deere's argument that the only remedy available under the warranty would have been repair or replacement of the defective parts because the evidence would allow a jury to conclude that Deere failed to respond to notice of the defects in a reasonable time and "replacement of only the defective components deprive[d] the buyer of the substantial value of the bargain." *Id.*, Doc. 85 at 12–13. This comparison illustrates precisely why Deere's handling of the warranty claims in these two cases do not create a *material* fact dispute. Unlike in *Nationwide Agribusiness*, there is no evidence that a covered defect caused the Molitor tractor fires, so Deere's alleged

delay in stating that there was no warranty coverage did not deprive Molitor of the substantial value of its bargain.

Accordingly, SECURA cannot prevail on its assertion that Deere's response to the notice of the fires caused the limited remedy in the warranty to fail of its intended purpose. This issue neither justifies denial of Deere's motion for summary judgment, nor supports SECURA's own summary judgment motion.[11]

## II.      SECURA's Motion to Exclude Expert Testimony

SECURA seeks to exclude certain portions of the testimony of Deere's expert witness Troy Schick. SECURA contends that Mr. Schick has improperly offered his legal opinions and otherwise offered opinions about matters for which he is unqualified or lacks foundation. For the reasons that follow, SECURA's motion is denied.

The party offering expert testimony has the burden to prove it is admissible by a preponderance of the evidence. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 696 (8th Cir. 2001). The admission of expert witness testimony is governed by Federal Rule of Evidence 702, and district courts serve a "gatekeeping function, ensuring that 'any and all

---

[11] SECURA also argues that the record demonstrates that Deere never intended to honor its warranty because the Warranty Manual provided to authorized dealers of Deere equipment are instructed "to deny warranty coverage for any and all fire claims." [Pl.'s Opp'n at 24–25.] SECURA's characterization of the evidence is unsupported by the record. The Manual tells the dealers to notify Deere immediately of any fire reported to them, and to reject fire claims that require additional investigation. [Manual at 16.] The Manual does not say anything about what *Deere's* response to a warranty claim based on a fire will necessarily be, and the evidence in this case shows that Deere did not reject the warranty claim regarding the Molitor tractor fires until it became clear that SECURA claimed the problem was the result of a design defect to which the warranty does not apply.

scientific testimony or evidence admitted is not only relevant, but reliable.'" *Union Pac. R.R. v. Progress Rail Servs. Corp.*, 778 F.3d 703, 709 (8th Cir. 2015) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). The admissibility of such evidence is committed to the district court's "broad discretion." *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006).

Nevertheless, the Eighth Circuit has stressed that Rule 702 has a "liberal thrust" favoring the admission of expert testimony. *Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014). That liberal approach is reflected in a "three-part test" under Rule 702. *Id.* at 561. The three relevant questions are: (1) whether the testimony would be "useful to the finder of fact in deciding the ultimate issue of fact," which means it must be relevant; (2) whether the expert is "qualified to assist the finder of fact"; and (3) whether the testimony is "reliable or trustworthy in an evidentiary sense." *Id.* A court may also consider the nonexclusive factors outlined in *Daubert* for determining admissibility of expert testimony under Rule 702, but such a consideration is not required in every case. *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012) (noting that the court should "use, adapt, or reject *Daubert* factors as the particular case demands") (quotation omitted).[12]

---

[12] Under *Daubert*, courts evaluating scientific testimony may consider whether the theory is capable of being or has been tested; if the theory has been peer reviewed; the known potential error rate for the theory and operational standards for a scientific technique; and if the theory or technique is generally accepted in the scientific community. *Russell*, 702 F.3d at 456.

When considering the usefulness or relevance of an expert's testimony, courts must consider whether the evidence relates to any of the issues in the case. *Daubert*, 509 U.S. at 591. And in determining whether a witness is sufficiently qualified, Rule 702 instructs courts to consider the witness's knowledge, skill, experience, training, or education. Fed. R. Evid. 702; *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1014 (8th Cir. 2012). "[A]n expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999); *see also Moe v. Grinnell College*, 547 F. Supp. 3d 841, 846 (S.D. Iowa 2021) ("The test is whether the expert's education and experience demonstrate a knowledge of the subject matter.").

And finally, in assessing the reliability of an expert's testimony, courts should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). Courts properly exclude expert testimony where it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Id.*

### A. Inadmissible Legal Conclusions

In his initial Expert Report, Mr. Schick noted that the limited warranty at issue in this case provides coverage for defects in materials and workmanship. He stated that for such a defect to be present "there must be a manufacturing defect (i.e., the tractor as built must have deviated from its intended design)." [Expert Report 32 1199 Subject Tractor

("1199 Report") at 4, Dkt. 126-2 (21cv1200).] Next, he opined that "for there to be a manufacturing defect (deviation from the intended design) under the facts and claims of this case, engine side shields must have been specified to be included on the subject tractor. However, engine side shields were not specified for the subject tractor, as they were never part of the intended design." [*Id.*]

Plaintiff argues that such opinions must be excluded because they are inadmissible legal conclusions. SECURA states that Mr. Schick is simply providing an interpretation of the meaning of the warranty's use of the terms "defect in materials or workmanship." Deere argues that these opinions are permissible because the Federal Rules of Evidence do not preclude an expert witness from offering an opinion on an ultimate issue in the case. Deere contends that Mr. Schick is not offering a legal opinion merely because he used language that parallels the applicable legal standards, and he is merely opining on whether the product contained a manufacturing defect as the term is understood in the agriculture industry. Deere relies on *Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003), to support the proposition that expert testimony on what industry practice and standards are is often admissible. *See also O'Reilly Auto. Stores, Inc. v. Bearing Techs., Ltd.*, No. 16-3102-CV-W-BP, 2018 WL 11424054, at *4 (W.D. Mo. Sept. 11, 2018).

Were there to be a trial in this matter, the Court would likely preclude any testimony in which Mr. Schick offered his legal opinions. But he would be free to testify as to his understanding of what the terms "materials and workmanship" are generally understood to mean within the relevant industry and how they were understood at Deere,

where he was employed for 23 years, holding positions including Senior Product Safety Technical Engineering Specialist, Senior Staff Engineer, Staff Scientist, Senior Engineer, and Engineer. The Court applied the same line in its consideration of Mr. Schick's opinions at the summary-judgment stage. Because the Court has not relied on the legal conclusions in Mr. Schick's testimony in its summary judgment ruling, and has concluded that Deere is entitled to summary judgment and denied SECURA's motion for summary judgment, the motion to exclude this aspect of Mr. Schick's testimony is denied as moot.

### B. Failure to Use Reliable Methods, Principles, or Standards

SECURA next argues that Mr. Schick did not base his opinion that the engine side shields were not a part of the subject tractors' intended design on reliable methods, principles, or standards. SECURA contends that Schick based his entire opinion only on his "personal assessment," failed to conduct an independent investigation into the intended design of the 2018.5 model year tractors, and failed to interview anyone involved in the actual design. SECURA suggests that Mr. Schick has offered nothing more than *ipse dixit* and that Deere asks the Court to trust his opinion merely because he was once a Deere employee.

Deere argues that Mr. Schick based his opinion on the intended design of the subject tractors based on his extensive experience as a Deere employee who, in fact, oversaw the product safety for the very model of tractor at issue. Mr. Schick also has personal knowledge of Deere's manufacturing processes and is familiar with how Deere's documentation system reflects the equipment's intended design. Deere further

31

points out that Mr. Schick reviewed the relevant documents relating to the parts that were to be included in the intended design in forming his opinions, including: the Bill of Materials and Birth Certificates for each machine; Parts Catalogs; and marketing materials.

SECURA's motion is denied. SECURA's arguments go to the weight of the evidence, not to its admissibility. The Court finds that Mr. Schick's involvement in the tractor's design, his extensive knowledge of Deere's manufacturing process, and his review of the relevant documentation sufficiently establish that his opinion was based on reliable methods, principles, and standards.

### C. Unhelpful Opinions

SECURA argues that Mr. Schick's testimony concerning the terms of the warranty and whether the intended design of the Subject Tractors included engine side shields are inadmissible because they would not be helpful to any jury. SECURA contends that if all Mr. Schick does is testify to the fact that engine side shields are not reflected in Deere's documentation that reflects which parts are included in the subject tractors, then his testimony is not necessary and would not help a fact finder understand such straightforward information. To the contrary, Deere argues that these opinions are admissible because they would be helpful to any lay juror. Deere suggests that Mr. Schick's specialized engineering knowledge, his familiarity with Deere's manufacturing process, and his understanding of the complex documentation system Deere uses to reflect the components of its machines is not within the understanding of the ordinary lay person.

SECURA's motion on this point is also denied. Mr. Schick's testimony concerning the absence of engine side shields from the parts that were supposed to be included on the Molitor tractors is certainly relevant and helpful in resolving the ultimate issues in these cases. Were these cases headed to a trial, the Court would certainly allow this testimony because it would be helpful to a jury. An ordinary layperson does not have an understanding of Deere's manufacturing and design process comparable to Mr. Schick's and would not be able to discern, with any reasonable efficiency, which parts are referenced throughout Deere's Bill of Materials, Parts Catalog, and in the Birth Certificate information. Deere has satisfied its burden to show that this testimony is admissible.

### D. Unreliable Opinion on the Cause of the Fire

Finally, SECURA argues that the testimony from Mr. Schick's rebuttal report concerning the cause and origin of the fire should be excluded because he did not apply the scientific method required by NFPA 921. Specifically, SECURA suggests that Mr. Schick failed to properly gather data, failed to formulate alternative hypotheses, and failed to test any hypotheses to determine a cause and origin. SECURA contends that Schick's opinions are unreliable because the only thing he did was exactly what Deere's counsel asked him to do—prepare a rebuttal to plaintiff's experts. Deere argues that Mr. Schick properly applied relevant portions of the NFPA 921 to arrive at valid criticisms of plaintiff's experts' cause-and-origin opinions.

SECURA's motion is denied as moot. The Court has not relied on any portion of Mr. Schick's testimony from his rebuttal report concerning the cause and origin of the

fire in reaching the conclusion that Deere is entitled to summary judgment. Because summary judgment will be entered for Deere in this matter, there will be no trial, and the Court need not rule on this issue at this time.

## ORDER

For the reasons stated above, the Court enters the following Order.

1.  In Case No. 21-cv-1199 (KMM/TNL):

    a.  Defendant's Motion for Summary Judgment [Dkt. 98] is **GRANTED**;

    b.  Plaintiff's Motion for Summary Judgment [Dkt. 116] is **DENIED**;

    c.  Plaintiff's Motion to Exclude Expert Testimony [Dkt. 123] is **DENIED**;

2.  In Case No. 21-cv-1200 (KMM/TNL):

    a.  Defendant's Motion for Summary Judgment [Dkt. 97] is **GRANTED**;

    b.  Plaintiff's Motion for Summary Judgment [Dkt. 115] is **DENIED**;

    c.  Plaintiff's Motion to Exclude Expert Testimony [Dkt. 122] is **DENIED**; and

3.  These actions are **DISMISSED WITH PREJUDICE**.

**Let Judgment be Entered Accordingly.**

Date: May 25, 2023

　　　　　　　　　　　　　　 *s/Katherine Menendez*　　　　　　　
　　　　　　　　　　　　　　 Katherine Menendez
　　　　　　　　　　　　　　 United States District Judge